**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Michael RAPP, a/k/a Michael Hellerman, Charles J. Bazarian, Mario Renda, John A. Bodziak, Jr., William Smith, Defendants–Appellants.**

No. 87–3180.

United States Court of Appeals,
Eleventh Circuit.

April 27, 1989.

John F. O'Donnell, Ft. Lauderdale, Fla., for Bazarian.

Shira A. Scheindlin, Budd, Larner, Gross, Picillo, Mark F. Pomerantz, New York City, for Renda.

Robert A. Leventhal, Orlando, Fla., for Bodziak.

William Smith, Maxwell AFB, Ala., pro se.

Robert J. Buonauro, Orlando, Fla., Alvin E. Entin, Laura B. Sayet, Miami, Fla., for Rapp.

J. Robert Bethel, Miami, Fla., for Smith.

Patty Merkamp Stemler, Dept. of Justice, Washington, D.C., for U.S.

Before RONEY, Chief Judge, COX, Circuit Judge, and MORGAN, Senior Circuit Judge.

COX, Circuit Judge:

## I.

This is a case about an elaborate financial scheme that hastened the demise of the Florida Center Bank (FCB) and that ultimately led to the convictions from which these appeals are taken. According to the indictment and the evidence, the plan was two-fold: the board of directors of FCB, whose membership included three of the defendants, would approve a $30 million loan application submitted by PaceCom, a company owned by another of the appellants, and the proceeds of the PaceCom loan would be used as collateral for the loan and as a source of money for the purchase of a substantial block of FCB stock. Each part of the scheme was related to, and depended upon, the other.

This conspiracy had its genesis in financial problems faced by Clyde Pitchford, a co-conspirator turned government witness. In the fall of 1985, Pitchford, a stockbroker in Richmond, Virginia, sought money to replenish that which he had stolen from the cash accounts of certain clients.[1] The source to which he turned was Michael Rapp.

While conducting business in Dallas on behalf of the Rex Group, an association of three individuals formed for the purpose of investing, Pitchford was contacted by Rapp, who was responding to a financial resume sent to him by Pitchford. Rapp described the financial opportunities available in the pay telephone business, which, according to Rapp, was a burgeoning industry due to recent deregulation. Rapp offered Pitchford a five million dollar fee if he could obtain a $20 million loan for Pace-Com, Rapp's pay telephone company.

Pitchford was intrigued at the prospect of receiving such an enormous fee. He explained Rapp's proposal to Rex Group partner Hugh Wiley and to Ben Cotton and Forrest Watson, principals in the Cornerstone Group, an investment firm in Dallas. All were interested. The following day, Rapp, William Smith, who was introduced as president of PaceCom, and their attorney met with members of the Rex and Cornerstone groups to explain the proposed deal in more detail. Initially, Rapp emphasized that his role in the loan transaction must not be revealed because he had served a prison sentence for involvement in a stock fraud swindle. Rapp then divulged his plan in great detail. Eventually, Smith, Cotton, and Pitchford executed a "Memorandum of Understanding" incorporating that which Rapp had explained. According to the memorandum, Cornerstone and Rex would marshal a $19 million loan in favor of PaceCom at a federally insured lending institution, and share the five million dollar fee. The loan would be secured by a $20 million certificate of deposit, as well as 2,000 pay telephones and the profits generated thereby. Interest on the certificate of deposit would be pre-paid. To calm concerns about the legality of the transaction, Rapp agreed to obtain an opinion letter from mutually acceptable counsel stating that the loan comported with all regulations, laws, and guidelines.

1. At the time of trial, Pitchford was serving a twenty-five year state sentence in Virginia; he had plead guilty to four counts of embezzlement and one count of bank fraud, all of which resulted from his pillage of clients' cash accounts. Pitchford also was indicted along with the appellants as a result of his participation in this conspiracy. In consideration of his guilty plea and cooperation, the government recommended that the federal sentence run concurrent with the state sentence.

The search for a bank that would make such a substantial loan to PaceCom continued over the next few weeks. The task was not an easy one because PaceCom was a fledgling company with a brief and dismal credit history. At the suggestion of mortgage broker Joseph Daddio, Rapp contacted John Bodziak, chairman of FCB's board of directors. Bodziak showed interest in the PaceCom loan; in it, he saw an opportunity to sell his FCB stock holdings, which he unsuccessfully had been attempting to do for some time. Cotton and Wiley met with Bodziak in Florida on October 10, 1985, to discuss Rapp's plan for success in what had become an interrelated loan and stock purchase transaction.

At this meeting, Cotton,[2] on behalf of Cornerstone/Rex and, surreptitiously, Rapp, and Bodziak, for himself, board member Robert Duncan, and minority stockholder Lawrence Whittle, executed an "Option to Purchase Bank Stock." Paragraph 17 of that agreement explicitly sets forth the relationship between the stock purchase and the PaceCom loan: "Cotton and Sellers agree that the motivating reason underwriting [sic] Cotton's acquisition of a majority of the stock in the Institution is the accommodation of the PaceCom transaction." Ownership of 55% of FCB stock, the portion offered in the option, would include the right to name a number of people to FCB's board of directors and would bring an influx of capital into the bank. Thus, the board could be stacked and the capital position strengthened, thereby insuring board approval of the PaceCom loan.

Rapp and Smith began the search for a source of funds to finance PaceCom's purchase of the certificate of deposit that would serve as security for the loan. The more difficult task, however, was securing a favorable opinion letter on the legality of the transactions. Initially, Rapp, Smith, and Bodziak, through Bodziak's attorney, Dominic Massari, hired Palmer Hamilton, a partner in the Mobile, Alabama law firm of Miller, Hamilton, Snider & Odom, to author a favorable letter addressing the merits of certain specific issues involved in the FCB–PaceCom transactions. A large fee was promised if the letter was written forthwith. Despite assurances by Rapp that the stock purchase and the PaceCom loan were not related and a promise that affidavits would be executed to that effect, Hamilton suspected otherwise. Following an investigation of the proposed transaction and the parties involved, Hamilton opined that the loan would be an unsafe and unsound banking practice. Rapp and Bodziak were displeased. Eventually, however, they obtained a favorable opinion from a Miami lawyer.

On October 25, 1985, as the self-imposed deadline for consummation of the FCB–PaceCom transaction drew nigh, Rapp, Smith, and Pitchford met with Charles Bazarian at his palatial Oklahoma City, Oklahoma home. Bazarian was joined by Mario Renda, a money broker from New York who was visiting Bazarian for the weekend. Rapp explained that PaceCom wanted to rent $20 million for one day so that it could buy a certificate of deposit to offer as security for FCB's loan to PaceCom. Assurances were given that the money actually never would leave Bazarian's possession. The "rental" of the money would work this way: Bazarian would provide a cashier's check that PaceCom would cash only after enough of the proceeds of the PaceCom loan to fund the check, plus a substantial fee, had been wired to Bazarian's bank account. Ed Mittlestet, president of the United Federal Savings and Loan Association, an institution at which Bazarian maintained an account, agreed to issue the check on the oral promise that the transaction would proceed as Rapp had described.

Rapp also had other preparations to make during those busy days prior to consummation of the transaction. In order to make the loan to PaceCom and to pay the interest on the certificate of deposit, FCB needed an infusion of cash. Rapp, Smith, and their cohorts turned to money brokers

---

**2.** As the impropriety of the FCB–PaceCom transactions became more apparent, Cotton and his partner Watson, much to the chagrin of the others, began asking questions. Eventually, both were excluded from further participation.

—intermediaries who generate deposits for banks. Bodziak, acting alone, approved a $250,000 undersecured loan for PaceCom to pay the brokers' fees. Three and one-half million dollars in deposits were brokered into FCB during the days preceding the closing. In addition, Renda brokered approximately four million dollars for FCB on the day the loan was closed, but after the closing had taken place.

The FCB board of directors met on October 28, 1985. In attendance were all four board members, including Bodziak and Duncan, Pitchford, Wiley, Smith and the Miami lawyer who had written the opinion letter. Rapp was secreted in an Orlando inn, but remained in contact with the others. During the meeting, the discussion turned to the PaceCom loan and the stock purchase. Bodziak presented the stock purchase agreement, and Duncan nominated Pitchford and Wiley to the board. A. Razzak Tai and Sam Murrell, two non-conspiring board members, asked whether there existed any relationship between the Rex Group, represented by Pitchford and Wiley, and PaceCom. Pitchford, Wiley, and Smith executed affidavits declaring that no relationship existed. The hour grew late, so the board adjourned, leaving for the morrow the business of the loan and the stock purchase.

That evening, Bodziak, Pitchford, Wiley, and Smith dined with Rapp, Renda, Renda's attorney, and Mittlestet. Renda and Mittlestet were in Orlando to deliver the cashier's checks, which totalled $10 million, as an accommodation to Bazarian. Bodziak complained privately to Pitchford that only a single source of funds had been found for both transactions. He feared that this would reveal the true relationship between the two transactions.

The board meeting resumed the following morning; the election of Pitchford and Wiley to the board was the first order of business. With Pitchford and Wiley as members, the board approved a $30 million loan to PaceCom. Each draw on the loan was to be secured by a 10–year certificate of deposit; interest on the certificate would be prepaid at the beginning of the 10–year term. In lieu of interest, FCB was to receive a percentage of PaceCom's profits over the life of the loan. The loan could not be called into default during the first ten years of its term.

Consummation of the PaceCom loan and the stock transfer was next on the board's agenda. As the closing began, Renda and his attorney waited outside the boardroom. The checks, which Mittlestet had signed prior to his early return to Oklahoma, were turned over to PaceCom. The transaction then proceeded as Rapp had planned. PaceCom, through Smith, bought a five million dollar, 10–year certificate of deposit with the first cashier's check. FCB prepaid all of the interest on the certificate and deposited that amount, approximately three million dollars, into PaceCom's account. Using the certificate as collateral, PaceCom borrowed five million dollars from FCB. The proceeds of the loan also were deposited into PaceCom's account, increasing the balance to $6.8 million.

PaceCom immediately made a second and third draw on its $30 million loan, using funds from its FCB account to purchase two additional certificates of deposit. The interest was deposited into PaceCom's account, as were the proceeds of the two additional five million dollar draws. At the conclusion of the third draw, PaceCom had $10.3 million in its FCB account and had repaid half of the $250,000 indebtedness which it had incurred earlier to pay the money brokers' fees. Bodziak then wired $10.3 million from PaceCom's account to Bazarian's account at United Federal Savings and Loan Association in Oklahoma. Later, Bazarian wired $100,000 to Renda's attorney for the beneficial use of Renda.

No additional draws were made against the loan although $15 million remained available. Instead, attention turned to the stock purchase. Pitchford purchased a five million dollar block of FCB stock, 24.5% of the outstanding shares, with the second cashier's check that Bazarian had provided, but said that the money had come from his personal account. Three million dollars was deposited into FCB's capital account,

with the remainder of the purchase price being distributed among the shareholders.

Within the two days following the close of the ill-fated board meeting, Bodziak became concerned that the relationship between the PaceCom loan and the stock purchase could be discovered easily. To hide the true nature of the transactions, he drafted documents purporting to show that Pitchford had borrowed five million dollars from Bazarian. Pitchford signed the fake, unenforceable promissory note, but Bazarian refused to do so.

As time passed, Pitchford realized that his financial quandary had not abated; he had received no money for his involvement in the FCB–PaceCom scheme. Instead, he possessed only shares of stock in a failing bank. Pitchford complained to Bodziak, who pacified Pitchford with a $100,000 loan. Later, Pitchford attempted to borrow additional sums from FCB, offering his shares of FCB stock as collateral. By that time, however, FCB had failed, and the Federal Deposit Insurance Corporation had assumed responsibility for the bank's insured debts. Soon thereafter, the impro-prieties were discovered, and the indictment in this case followed.

## II.

Count One of the indictment alleges that each of the appellants conspired, in violation of 18 U.S.C. § 371, to defraud FCB, to misapply its funds, to transport fraudulently obtained money in interstate commerce, to make false entries in the bank's records, to make false representations to it in connection with a loan application, and to use interstate wire or telephone communications systems to further those wrongs. Count Two charges each appellant with executing a scheme to defraud FCB, in violation of 18 U.S.C. § 1344.[3] In Count Three, the appellants are charged with wire fraud, a violation of 18 U.S.C. § 1343.[4] Count Five[5] alleges that Bodziak, aided and abetted by Rapp and Smith, willfully misapplied FCB funds, in violation of 18 U.S.C. § 656.[6] Count Six also alleges that FCB funds willfully were misapplied, but names each of the appellants. In Counts Seven, Eight, and Nine, it is alleged that Bodziak, Rapp, and Smith violated 18 U.S.C. § 1005,[7] which prohibits the entry of

---

3. 18 U.S.C.A. § 1344(a) (West Supp.1988) provides:

> Whoever knowingly executes, or attempts to execute, a scheme or artifice to defraud a federally chartered or insured financial institution; or to obtain any of the moneys, funds, credits, assets, securities or other property owned by or under the custody or control of a federally chartered or insured financial institution by means of false or fraudulent pretenses, representations, or promises, shall be fined not more than $10,000, or imprisoned not more than five years, or both.

4. 18 U.S.C.A. § 1343 (1984) provides:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

5. Count Four of the indictment, charging that each appellant caused fraudulently obtained money to be transported in interstate commerce, is not relevant to this appeal; each de-fendant's motion for a judgment of acquittal was granted as to that count.

6. 18 U.S.C.A. § 656 (1976) provides in pertinent part:

> Whoever, being an officer, director, agent or employee of, or connected in any capacity with any Federal Reserve bank, member bank, national bank or insured bank, or a receiver of a national bank, or any agent or employee of the receiver, or a Federal Reserve Agent, or an agent or employee of a Federal Reserve Agent or of the Board of Governors of the Federal Reserve System, embezzles, abstracts, purloins or willfully misapplies any of the moneys, funds or credits of such bank or any moneys, funds, assets or securities intrusted to the custody or care of such bank, or to the custody or care of any such agent, officer, director, employee or receiver, shall be fined not more than $5,000 or imprisoned not more than five years, or both; but if the amount embezzled, abstracted, purloined or misapplied does not exceed $100, he shall be fined not more than $1,000 or imprisoned not more than one year, or both.

7. 18 U.S.C.A. § 1005 (1976) reads, in part, as follows:

> Whoever makes any false entry in any book, report, or statement of [any Federal

false statements in the books and records of FCB. Finally, Count Ten charges that Bodziak, Rapp, ar.d Smith made a false statement in connection with a loan application, an act prohibited by 18 U.S.C. § 1014.[8] Each substantive count also alleges in the alternative that the persons named aided and abetted the commission of the crime charged therein. *See* 18 U.S.C. § 2 (1969).

Trial began in early January, 1987. Three weeks later, the government completed its presentation of evidence. Judgments of acquittal were entered on Count Four as to all defendants, and Duncan's motion for a judgment of acquittal, which was aimed at all relevant counts, was granted in its entirety. Thereafter, Counts Five and Six were dismissed as to Rapp and Smith, and, on motions of Rapp and Smith, the jury commenced its deliberations as to them. Rapp was adjudged guilty on all remaining counts. Smith was declared guilty on all counts except Count Nine.

The trial resumed the following day with the remaining defendants presenting their defenses. At the conclusion of that phase of the trial, the motions for judgments of acquittal were renewed. The district judge granted Massari's motion in full. Renda obtained a judgment of acquittal on all relevant substantive counts, but was unsuccessful on the conspiracy count. All other motions were denied.

After more than a week of deliberation, the jury returned its verdicts. Bodziak was found guilty on all counts submitted to the jury, except Count Three. Renda was convicted on Count One. The jury adjudged Bazarian guilty on Counts One, Two, and Six. We now consider the appeal of each convicted defendant, specifically addressing only those issues that merit discussion.

### III.

Each appellant contends that the evidence presented at trial is insufficient to support certain of the jury's verdicts. The standard which guides our review of these arguments is whether, viewing the evidence and all reasonable inferences to be drawn therefrom in the light most favorable to the government, *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), substantial evidence exists to support the verdicts. *Hamling v. United States*, 418 U.S. 87, 124, 94 S.Ct. 2887, 2911, 41 L.Ed.2d 590 (1974).

### A.

■ Initially we address Rapp's contention that the evidence is legally insufficient to support his convictions on Counts Seven through Ten. Counts Seven, Eight, and Nine allege that Rapp, with intent to injure and defraud FCB, made, or aided and abetted the making of, certain affidavits executed by William Smith, Clyde Pitchford, and Hugh Wiley, each falsely attesting to the absence of any financial relationship or interest between PaceCom and Pitchford or Wiley. To substantiate the statutory violations alleged in those counts, the government must prove beyond a reasonable doubt that Rapp *knowingly* and *willfully* made, or directed or authorized the making of, a false entry concerning a material fact in a book or record of FCB with knowledge of its falsity and with the intent to defraud or deceive FCB. *See United States v. Jackson*, 621 F.2d 216, 219 (5th Cir.1980) (setting forth the elements that must be proved to establish a violation of 18 U.S.C.

---

Reserve bank, member bank, national bank or insured bank] with intent to injure or defraud such bank, or any other company, body politic or corporate, or any individual person, or to deceive any officer of such bank, or the Comptroller of the Currency, or the Federal Deposit Insurance Corporation, or any agent or examiner appointed to examine the affairs of such bank, or the Board of Governors of the Federal Reserve System shall be fined not more than $5,000 or imprisoned not more than five years, or both.

**8.** 18 U.S.C.A. § 1014 (West Supp.1988) provides in relevant part:

Whoever knowingly makes any false statement or report, or willfully overvalues any land, property or security, for the purpose of influencing in any way the action of ... any bank the deposits of which are insured by the Federal Deposit Insurance Corporation ... upon any ... loan shall be fined $5,000 or imprisoned not more than two years, or both.

§ 1005); *United States v. Walker*, 621 F.2d 163, 165–67 (5th Cir.1980) (regarding aiding and abetting). Count Ten alleges that Rapp caused William Smith to submit a false affidavit to FCB in connection with PaceCom's loan application. A violation of 18 U.S.C. § 1014 is proved by evidence that Rapp *knowingly* and *willfully* authorized or directed Smith's making of the false affidavit with the intent to influence the decision-making process of FCB on the loan application and that the affidavit concerned a material fact. *See United States v. Kelley*, 615 F.2d 378, 380 (5th Cir.1980) (setting forth the elements necessary to establish a violation of 18 U.S.C. § 1014); *Walker*, 621 F.2d at 165–67.

We conclude, after a careful reading of the evidentiary record, that the jury's verdicts as to Rapp on Counts Seven through Ten are not supported by the required quantum of evidence. The record is devoid of evidence that Rapp knowingly or willfully directed or authorized the making of the affidavits. No witness testified that Rapp specifically directed the affiants to execute the documents or that he had knowledge that affidavits would have to be executed in order to consummate the loan. In fact, there is no evidence that Rapp even knew, prior to reading the indictment, that affidavits had been executed. This case, therefore, is more tenuous than *United States v. Giles*, 300 U.S. 41, 57 S.Ct. 340, 81 L.Ed. 493 (1937), because Giles specifically knew that the false entries on the bank's ledger necessarily would result from his deliberate action of withholding deposit tickets. *Id.* at 49, 57 S.Ct. at 344.

It is true, as the government argues, that Rapp set in motion the events that led to the closing during which the affidavits were executed and that he wanted concealed the true relationship between Pace-Com, the borrower, and Pitchford and Wiley, the investors. Moreover, it is arguable that the execution of the documents reasonably could be foreseen as a natural consequence of the conspiracy. These arguments, however, which are based on *Pinkerton v. United States*, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946), compelling as they are, cannot support these verdicts;

the government did not request that the jury be instructed relative to vicarious liability under *Pinkerton*, and the court did not give such an instruction.

### B.

■ Bazarian and Renda also challenge the sufficiency of the evidence; both argue that the government failed to present facts from which a reasonable jury could conclude or infer that they had knowledge of the fraudulent objective of the conspiracy. We disagree.

First, the indictment alleges, and the evidence proves, that two of the primary objectives of this detailed conspiracy were to defraud FCB and misapply its funds by covertly pledging as security for the Pace-Com loan certificates of deposit purchased with proceeds of the loan, thereby leaving FCB in an essentially unsecured position with respect to the loan, and by purchasing FCB stock with the bank's own money. The appellants misread the indictment when they state that the sole objective was to take over FCB; that was a manner in which the conspiracy was furthered, not an objective. Second, there is ample evidence that proves that Bazarian and Renda had knowledge of these objectives. During his direct examination, Pitchford testified that "the whole thing, the borrowing against the CD" was discussed with Bazarian and Renda. Further, according to Pitchford, Rapp stated, assuringly, that "there is no catch involved. . . . [W]hen your office notifies you that the fed wire has been received back for your twenty million and your fee, then you release the check. There is no possibility that you won't get your money back." From this testimony alone, the jury reasonably could have concluded that Bazarian and Renda knew that the money that would be wired to Oklahoma to fund the cashier's checks would come from the proceeds of the FCB loan to PaceCom; it strains logic to accept any other interpretation. Moreover, Pitchford's testimony revealed that Bazarian and Renda knew the role which the cashier's checks would play in the PaceCom loan transaction and that the necessary re-

sult of such a transaction was that FCB unknowingly would be providing essentially an unsecured, multi-million dollar loan to PaceCom.

Although the evidence may not prove that the appellants knew about the stock purchase aspect of the conspiracy, it does not follow that this fact precludes their convictions. It is well-settled that a conspirator need not know all the details of the conspiracy, *Blumenthal v. United States*, 332 U.S. 539, 557, 68 S.Ct. 248, 256, 92 L.Ed. 154 (1947), nor participate in every aspect of it, *United States v. Guida*, 792 F.2d 1087, 1098 (11th Cir.1986). Therefore, these convictions stand despite the appellants' claims that they did not know the exact scope of the conspiracy.

## IV.

■ Bazarian and Renda contend further that the district judge prejudicially infringed on their constitutional and statutory rights to be present and to have assistance of counsel at every stage of their criminal trial, *see* U.S. Const. amend. VI;[9] Fed.R.Crim.P. 43(a),[10] by responding to a written communication from the deliberating jury without first consulting counsel and providing the defendants and their attorneys the honor of being privy to the response.[11]

These are the facts giving rise to this aspect of the appeal. The jury retired to deliberate on February 3, 1987. During the course of its deliberation, the jury sent several written communications to the district judge. On the first three occasions, the judge followed the proper procedure; counsel was informed of the substance of the note and afforded an opportunity to be heard before the judge responded. In handling the fourth question, however, the judge chose a different course. The jury, after five days of deliberation, indicated that it had reached a unanimous verdict as to Bodziak and Wiley, but could not do so as to Bazarian and Renda. Perplexed, it asked: "What should we do from here?"[12] Without consulting counsel, who, we are told, anxiously were awaiting the jury's verdict just outside the courtroom, the judge assembled the jury in an anteroom adjacent to the courtroom[13] and delivered a modified *Allen*[14] charge. Neither counsel nor their clients were present. Only later did they learn of the jury's note and, upon filing a handwritten motion, its substance. At a subsequent in-chambers conference,

---

**9.** The Sixth Amendment provides:

> In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence.

U.S. Const. amend. VI.

**10.** Rule 43(a) provides:

> The defendant shall be present at the arraignment, at the time of the plea, at every stage of the trial including the impaneling of the jury and the return of the verdict, and at the imposition of sentence, except as otherwise provided by this rule.

Fed.R.Crim.P. 43(a).

**11.** This court has chastised this district judge for similar conduct in two recent cases. In *Bank South Leasing v. Williams*, 778 F.2d 704 (11th Cir.1985), this judge provided the jury with supplemental written instructions defining estoppel without consulting counsel or affording them

an opportunity to be heard. Although this court did not address the merits of this alleged error, we did state that "this conduct on the part of the trial judge was likely improper." *Id.* at 707 n. 2. In *United States v. Guida*, 792 F.2d 1087 (11th Cir.1986), this judge, responding to a request by the jury, allowed the jury to study an unredacted copy of the witness and exhibit list. Counsel was not notified or consulted. This was held to be error, but was adjudged harmless since substantial evidence concerning all of the listed exhibits had been admitted during the trial. *Id.* at 1091–94. Our prior criticism of this improper procedure apparently has gone unheeded.

**12.** The note, in its entirety, reads as follows:

> We the jury cannot render a unanimous decision on the Counts of Mr. Bazarian or Mr. Renda.
>
> We have decided on the Counts containing Mr. Wiley, and Mr. Bodziak. What should we do from here?

**13.** Apparently, this judge's courtroom was occupied by another judge hearing a different case.

**14.** *Allen v. United States*, 164 U.S. 492, 501–02, 17 S.Ct. 154, 157–58, 41 L.Ed. 528 (1896).

Bazarian and Renda moved for a mistrial and, alternatively, requested that the jury be reminded, as they had been the day before, that they unanimously must agree on which of the six objects of the conspiracy each defendant conspired to commit. The defendants did not argue, however, that the charge given by the court in response to the note was a misstatement of the law. The judge denied both requests. Twenty-seven hours later the jury returned its unanimous verdicts.

Initially, we explicitly set forth the procedure that properly should be followed by a judge presented with a communication from a deliberating jury. That which follows is simply a restatement of established jurisprudence of which the district judge should have been aware. In *Rogers v. United States*, 422 U.S. 35, 95 S.Ct. 2091, 45 L.Ed.2d 1 (1975), the Supreme Court, citing two of its early twentieth century cases and the Federal Rules of Criminal Procedure, stated that it was clear that a message from a jury should be answered in open court after counsel has been informed of its substance and has been given an opportunity to be heard. *Id.* at 39, 95 S.Ct. at 2094 (citing *Shields v. United States*, 273 U.S. 583, 588–89, 47 S.Ct. 478, 479, 71 L.Ed. 787 (1927); *Fillippon v. Albion Vein State Co.*, 250 U.S. 76, 81, 39 S.Ct. 435, 436, 63 L.Ed. 853 (1919); Fed.R.Crim.P. 43.). *Accord United States v. McDuffie*, 542 F.2d 236, 241 (5th Cir.1976) ("The procedure that should have been employed is well established. When a communication is received from the jury, counsel should be informed of its substance and afforded an opportunity to be heard before a supplemental charge is given."). There is no justification, therefore, for deviating from this procedure in responding to this jury's communication; the trial court erred by doing so. *See Rogers*, 422 U.S. at 40, 95 S.Ct. at 2095; *McDuffie*, 542 F.2d at 241.

■ Though error was committed, reversal does not necessarily follow. Rather, we must determine whether this infringement on the appellants' fundamental rights to personal presence and assistance of counsel at all critical stages of their trial is harmless. *Rushen v. Spain*, 464 U.S. 114, 118–19, 104 S.Ct. 453, 455–56, 78 L.Ed.2d 267 (1983); *Rogers*, 422 U.S. at 40, 95 S.Ct. at 2095. We conclude that Bazarian and Renda suffered no actual prejudice as a result of the mishandling of the jury communication; consequently, the error is harmless.[15]

The factual scenario presented here is not unique; this court has reviewed for prejudice other cases in which the trial court, in response to a jury communication, delivered supplemental instructions without notifying or consulting counsel, and in the defendant's absence. In *United States v. McDuffie*, 542 F.2d 236 (5th Cir.1976), the trial court, on its own initiative and without receiving input from counsel, heeded the jury's request and reinstructed on the meaning of the terms "control" and "possession." *Id.* at 238. Similarly, the trial judges in *United States v. Breedlove*, 576 F.2d 57 (5th Cir.1978), and *United States v. Betancourt*, 734 F.2d 750 (11th Cir.1984), without prior consultation, answered substantive legal questions from the jury outside the presence of the defendants and their counsel. *Breedlove*, 576 F.2d at 59; *Betancourt*, 734 F.2d at 759. Other cases involve the mishandling of wholly innocuous requests from the jury. In *United States v. Zielie*, 734 F.2d 1447 (11th Cir. 1984), and *United States v. Bascaro*, 742 F.2d 1335 (11th Cir.1984), the judges, in the absence of counsel, performed the ministerial task of instructing the jurors that they would have to rely on their own recollection of the evidence since the trial testimony had not yet been transcribed. *Zielie*, 734 F.2d at 1460; *Bascaro*, 742 F.2d at 1354–55. The improper communication in each of these cases was criticized and adjudged erroneous. None of the convictions was reversed, however, because each error was harmless. In *McDuffie*, this court recognized that the judge's response was directly responsive to the jury's question and correctly stated the law; consequently, no prejudice was shown to have resulted.

---

15. Because we resolve this issue in this manner, we assume without deciding that this error was of constitutional dimension. *See Rushen*, 464 U.S. at 117 n. 2, 104 S.Ct. at 455 n. 2.

*McDuffie,* 542 F.2d at 241. This court and its predecessor, citing *McDuffie,* also found this reasoning decisive in each of the other cases. *Bascaro,* 742 F.2d at 1355; *Zielie,* 734 F.2d at 1460; *Betancourt,* 734 F.2d at 759; *Breedlove,* 576 F.2d at 60.

Similarly, the trial judge in this case delivered a supplemental instruction in the absence of Bazarian and Renda without input from their counsel. The only difference between this case and those discussed above is that the supplemental instruction given was a modified-*Allen* charge, which the appellants do not argue was not responsive to the question or was a misstatement of the law. That the *Allen* charge was involved, however, is not a factual difference that renders the communication prejudicial *per se.* Instead, some prejudice must be shown to have resulted from this error.

The appellants argue that the error caused prejudice in three ways. First, they contend that the trial court deprived them of the opportunity to dissuade the court from giving the modified-*Allen* charge and to request that a mistrial be declared. This was not prejudicial, however, for there exists no absolute right to be forewarned before the *Allen* charge is given. *See United States v. Bailey,* 468 F.2d 652, 663–64 (5th Cir.1972), *adopted on rehearing,* 480 F.2d 518 (1973) (en banc). Moreover, the court listened to the defendants' arguments after the charge, but while the jury was still deliberating, and could have declared a mistrial had he been convinced to do so. Instead, he specifically rejected the defendants' arguments, stating that he would not have declared a mistrial in any event.

The appellants also contend that they suffered prejudice as a result of the court's error in that they did not have the chance to request that the judge respond to the jury's question by giving a different supplemental instruction, one that would remind the jury that they unanimously must agree on which object of the conspiracy the defendant conspired to commit. This argument is not persuasive. The trial court specifically rejected this request in the post-*Allen* charge conference. Additional-

ly, the judge had given this same instruction a day earlier in response to another of the jury's questions.

Finally, Bazarian and Renda argue that the modified—*Allen* charge was confusing. The jury, so the argument goes, might have believed that the court would have declared a mistrial as to all of the four defendants if unanimous verdicts were not rendered against each of them. This contention, however, was not raised in the court below; rather, the appellants make this argument for the first time on appeal. Thus, the argument will not be considered. *See United States v. Hill,* 622 F.2d 900, 908 (5th Cir.1980).

Though we do not condone the manner in which the trial court proceeded, we cannot reverse these convictions if the error was not prejudicial. The appellants arguments of prejudice are not persuasive, and no prejudice is apparent to us. Accordingly, the convictions must stand.

## V.

■ Bodziak, Bazarian, and Renda, the defendants adjudged guilty in the second phase of the jury's deliberations, allege separately that the trial was rendered unfair by the court's statement to the jury regarding the sudden midtrial absence of co-defendant Duncan, whose motion for a judgment of acquittal had been granted in its entirety. After the jury returned its verdicts as to Rapp and Smith, and before the remaining defendants began presentation of their defenses, the court gratuitously informed the jurors that it had dismissed the case against Duncan. Specifically, the court stated:

> At the close of the government's case the court found as a matter of law that the government had introduced insufficient evidence for you to find beyond [a] reasonable doubt that Mr. Robert Duncan had done any criminal acts as alleged in the indictment. Therefore, the court has dismissed Mr. Duncan from this suit.

Defendants' counsel moved for a mistrial, arguing that this unsolicited comment, which, so the argument goes, only could be interpreted as an indication that the other

defendants probably were guilty, invaded the exclusive province of the jury and destroyed the presumption of innocence. The court denied the motion and refused counsels' requests that it immediately admonish the jury to draw no inferences from its remarks concerning Duncan.

When a co-defendant has mysteriously vanished from the trial, there exists a genuine risk that his absence subconsciously may affect the jury's assessment of the guilt of the remaining defendants. That possibility is enhanced when the absence occurs in the waning moments of a lengthy trial. Recognizing this, the trial judge decided to prevent curiosity, conjecture, and speculation by giving a simple and honest statement to the jury conveying the reason for Duncan's departure. Many experienced trial judges think this is the "best, safest and fairest procedure." *See United States v. Beasley*, 519 F.2d 233, 239 (5th Cir.1975), *vacated on other grounds*, 425 U.S. 956, 96 S.Ct. 1736, 48 L.Ed.2d 201 (1976).

It is argued that the court overstepped the bounds of prudence by divulging the precise reason for its dismissal of Duncan—that the government had introduced insufficient evidence upon which to base a conviction. We agree that the court's remarks are suspect, especially in light of the court's refusal to instruct the jury that Duncan's acquittal should not affect the deliberations still facing them. *See United States v. DeLucca*, 630 F.2d 294, 298 (5th Cir.1980). We do not decide, however, whether the statement is improper for, even if it is, the error was harmless; it did not affect any substantial rights of the appellants. *See* Fed.R.Crim.P. 52(a).

The presumption of innocence, which the appellants allege was thwarted by the court's actions, is a substantial right indeed! But, the court's decision to inform the jury that the government failed to prove its case against Duncan and its refusal to give an immediate limiting instruction did not affect that right. During his instructions to the jury at the close of the

second phase of the case, the judge instructed the jury, as he had done at the conclusion of the first phase, that the defendants are presumed innocent until proven guilty beyond a reasonable doubt. The jury also was told that its decision should be based solely on the evidence produced at trial and, more importantly for present purposes, that the evidence did not include anything that he, the judge, had said during the course of the trial. Finally, he admonished the jury that "the case of each defendant should be considered separately and individually." Although the better practice in this situation is simply to acknowledge a defendant's absence to the jury and instruct that it should not affect their deliberations as to the remaining defendants, *United States v. Barrientos*, 758 F.2d 1152, 1156 (7th Cir.1985); *see DeLucca*, 630 F.2d at 298, the course of action chosen by the court in this case does not amount to reversible error. *See DeLucca*, 630 F.2d at 298–300; *United States v. McCoy*, 539 F.2d 1050, 1064 n. 22 (5th Cir. 1976).

### VI.

Based on the foregoing, we reverse Michael Rapp's convictions on Counts Seven through Ten because the evidence is insufficient to support the jury's verdicts. Otherwise, the judgments of the district court are affirmed.[16]

AFFIRMED IN PART; REVERSED IN PART.

---

**16.** All issues raised by the appellants were given careful consideration. Those not specifically addressed in our opinion do not merit discussion.