[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
January 31, 2008
THOMAS K. KAHN
CLERK

_____

No. 06-16602
Non-Argument Calendar

_____

D. C. Docket No. 06-20114-CR-JEM-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

MARK PELLE,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(January 31, 2008)**

Before CARNES, MARCUS and WILSON, Circuit Judges.

PER CURIAM:

This is Mark Pelle's appeal of his conviction and sentence for mail fraud,

wire fraud, and conspiring to commit mail and wire fraud.

## I.

Mark Pelle was a salesman for Pantheon Holdings, a "business opportunity business" that sold Internet kiosks to would-be entrepreneurs. The kiosks supposedly had features ranging from email access to dispensing flowers. Pantheon salespeople told potential purchasers that Pantheon would assign them an exclusive territory for their kiosks, find good locations for them, install the kiosks, and provide technical support. Salespeople also told the purchasers about deals Pantheon had brokered whereby ads would be would pre-loaded onto the kiosks, and businesses would pay a monthly rate for the ads to be displayed.

As part of the sales pitch, salespeople, including Pelle, would tell purchasers that each kiosk had a projected monthly income of $1,500 to $5,500 and provide a list of current kiosk owners as references. One kiosk cost between $10,980 and $19,980, and Pantheon would offer discounted rates on additional purchases.

The reality of Pantheon's business was very different from its image. Its owners were a group of ex-convicts who had run a number of other business opportunity businesses. Richard Goodman was responsible for all of Pantheon's day-to-day operations, but a series of apparently respectable people were brought in to be "puppet president[s]" because he had a criminal record that would have to

be disclosed to potential purchasers. Of the approximately 1,200 kiosks sold, about 900 were shipped, and only about 350 were ever installed. Pantheon sold kiosks to multiple purchasers in the same "exclusive" area. The projected income claim was entirely speculative. The kiosks did not have pre-loaded ads, and Pantheon had no deals with advertisers. Pelle was told that Pantheon had never found a single advertiser to place a single ad on a single kiosk.

Pantheon paid the references $15 per call, and not all of the references even owned a kiosk. One of the references, Joe Lieberman, had been a salesman with Pelle for a company that Pantheon's owners ran before they started Pantheon. Another, Frank DePierre, was sent a kiosk for free after about three months as a reference, but he did not bother to install it, even after Goodman paid a friend who owned a local deli to allow the kiosk to be installed there. DePierre was brought in as a reference because he told Goodman that he was an "expert sales closer" and "there wouldn't be any reference in the world better than him." Some Pantheon salespeople would also pay references an additional sum for help convincing purchasers to buy. For example, Pelle would pay Liberman $100 every time Lieberman would show his kiosk to one of Pelle's leads.

After a while, angry purchasers began posting complaints about the

company on the Internet, including on a website called "Ripoff Report."[1]  Fearful

that the complaints would impact sales, the company started doing business as

"Pantheon," instead of under its corporate name "Pantheon Holding."  After the

complaints continued to pile up, Pelle suggested that salespeople tell prospective

that the complaints were misinformation by competitors who wanted to sabotage

Pantheon's business.  Pelle even coined the phrased "Internet terrorists" to refer to

them.

Pelle earned $220,000 in commissions from selling the kiosks.  As Goodman

testified, although the model sales pitch given to Pantheon salespeople was already

"full of misrepresentations," Pelle had the "terrible habit . . . of exaggerating the

numbers in the script."  He would generally double the number of people in the

locating division and the kiosks' projected income.  Goodman repeatedly spoke to

Pelle about exaggerating what the locating division would do for purchasers.  Pelle

responded that it was all "fake," "[t]hat it was terrible," and "that he didn't really

care."

In September 2004, federal agents obtained and executed a search warrant

for Pantheon's offices.  Goodman began cooperating with the government shortly

thereafter.

---

[1] Ripoff Report Homepage, http://www.ripoffreport.com (last visited December 21, 2007).

Pelle and eight other people associated with Pantheon were charged with mail fraud, wire fraud, and conspiracy to commit mail and wire fraud, in violation of 18 U.S.C. §§ 1341, 1343, and 1349. Six pleaded guilty, but Pelle and DePierre pleaded not guilty and were tried jointly. Six days into the eight day trial, toward the end the government's case-in-chief, DePierre's attorney requested a sidebar. He told the court that DePierre was complaining of dizziness and asked for a brief recess. The judge excused the jury, explaining that the sidebar "might take us a couple minutes" and suggesting that everyone "take a short break." Before the jury returned, DePierre was taken to the hospital. The trial court dismissed the jurors for the day rather than have them return to find DePierre's absent.

The following day the court learned that DePierre had suffered a serious stroke, and it granted the unopposed motion of DePierre's counsel's for a mistrial as to his client. Pelle also moved for a mistrial based on what had happened to DePierre, but the district court denied his motion. The court did, however, instruct the jury that it was "not to speculate as to the absence of or why Mr. DePierre is no longer standing trial" and that "[h]is absence should not control or influence [its] verdict in any way whatsoever with respect to the defendant, Mark Pelle." The trial then proceeded.

Following the government's case, Pelle testified in his own defense. He

claimed that he believed Pantheon was a legitimate business and that he had not knowingly defrauded anyone. He testified that he had simply been "unbelievably" stupid. The court then charged the jury. Along with the rest of the jury charge, the district court gave a deliberate ignorance instruction, telling the jury that willful blindness is equivalent to knowledge. The jury returned a verdict finding Pelle guilty on all of the counts in the indictment.

The probation office then prepared a presentence investigation report, which assigned Pelle a base offense level of seven under United States Sentencing Guideline § 2B1.1 (Nov. 2005), the guideline applicable to convictions for fraud. The PSR also attributed $2,812,652 in losses to Pelle, enhancing his offense level by eighteen. See U.S.S.G. § 2B1.1(b)(1)(J) (providing for an eighteen level enhancement for losses between $2,500,000 and $7,000,000). Finally, the PSR recommended both a four-level enhancement under U.S.S.G. § 2B1.1(b)(2)(B) because Pelle caused losses to at least fifty but fewer than two hundred fifty victims, and a two-level enhancement under U.S.S.G. § 3C1.1 because Pelle had obstructed justice by committing perjury at trial. With a total recommended offense level of thirty-one and a criminal history I, the PSR calculated Pelle's advisory guideline to be 108 to 135 months imprisonment.

Pelle made numerous objections to the PSR, including that: (1) the loss

amount in the PSR did not account for the value of the kiosks actually delivered to the purchasers and (2) the loss amount and number of victims in the PSR violated Pelle's Sixth Amendment rights because they were neither found by the jury nor admitted by him.

The district court overruled the defendant's objections, arriving at the same advisory guideline range that the PSR had. Considering the guideline range and the 18 U.S.C. § 3553(a) factors, the district court sentenced Pelle to 108 months imprisonment, the lowest sentence within the advisory guideline range.

Pelle now appeals, contending that the district court erred by: (1) denying his motion for a mistrial; (2) instructing the jury on deliberate indifference; (3) failing to decrease the amount of loss by the value of the kiosks delivered when calculating the amount of loss for U.S.S.G. § 2B1.1(b)(1) purposes; (4) sentencing him based on facts neither admitted by him nor found by the jury; and (5) enhancing his sentence for obstruction of justice.

## II.

As for Pelle's contention that the district court erred by denying his motion for a mistrial, we review that decision only for an abuse of discretion, which requires that the defendant have suffered compelling prejudice. See United States v. Knowles, 66 F.3d 1146, 1158–1159 (11th Cir. 1995) ("To demonstrate that the

district court abused its discretion, a showing of 'compelling prejudice' is required."). The burden of showing compelling prejudice is heavier when the district court issues a curative instruction. See United States v. Ramirez, 426 F.3d 1344, 1352 (11th Cir. 2005) ("A jury is presumed to follow the instructions given to it by the district judge.").

Pelle first argues that he suffered compelling prejudice by being forced to continue in DePierre's absence, because the jury could have improperly inferred that DePierre suffered a stroke as a physiological response to testimony, inferring that he was guilty and so, too, must be Pelle. Even setting aside the utterly conjectural nature of this argument, its core factual premise lacks any support in the record. DePierre complained quietly to his attorney about being dizzy, at which point the attorney requested a sidebar. The jury was then dismissed, and, when it was reconvened the next day, DePierre was absent. No one told the jury why.

Nor did the simple fact of DePierre's absence prejudice Pelle. In United States v. Rapp, 871 F.2d 957 (11th Cir. 1989), we affirmed the district court's denial of a mistrial even though the court told the jury that a co-defendant had been dismissed from the case because the evidence against him was insufficient; we said that the court's curative instruction prevented any resulting prejudice. Id. at

8

967–68. We did, however, note that "the better practice in this situation is simply to acknowledge a defendant's absence to the jury and instruct that it should not affect their deliberations as to the remaining defendants," id. at 968, which is exactly what the district court did here. It told the jury that DePierre was "no longer a part of the trial," instructed the jury "not to speculate as to the absence of or why [he was] no longer standing trial," and told the jury that "[h]is absence should not control or influence [its] verdict in any way whatsoever with respect to" Pelle. The district court followed the best possible course in dealing with DePierre's stroke.

Pelle also argues that he suffered compelling prejudice from being forced to continue as the only defendant because the evidence that had been admitted against DePierre tainted the jury against Pelle. His theory is that, as a result of DePierre's mistrial, DePierre did not put on a defense to refute the government's evidence, which caused spill over prejudice to Pelle. As we stated in United States v. LeQuire, 943 F.2d 1554 (11th Cir. 1991), "[c]ompelling prejudice cannot be solely proved by the quantity of evidence presented against codefendants. Instead, we must determine whether the jury could sift through all of the evidence and render an impartial verdict as to each defendant." Id. at 1563 (citations omitted); see United States v. Garcia, 405 F.3d 1260, 1272 (11th Cir. 2005) ("[A] defendant

9

does not suffer compelling prejudice simply because much of the evidence admitted at trial is applicable only to co-defendants."). The district court directed the jury that to consider only the evidence against Pelle, and that instruction was enough to avoid any prejudice. Id. ("When a curative instruction is given, this court reverses only if the evidence is so highly prejudicial as to be incurable by the trial court's admonition." (citation and quotation marks omitted)).

In addition, Pelle has not identified a single piece of evidence introduced at trial that would not have been admissible against him had he been tried separately. He has not explained why the evidence against DePierre was so inflammatory or confusing that "the jury could not make an individualized determination as to his guilt or innocence." Ramirez, 426 F.3d at 1352.

Finally, Pelle argues that DePierre might have testified in his own defense at a joint trial and, if he did, his testimony might have corroborated Pelle's. This argument is utterly speculative. At the time the district court denied Pelle's motion it was not even clear that DePierre would survive his serious stroke or, if he did, that he would be in good enough health to be retried in a reasonable period of time. There was nothing to indicate that if he survived and was able to be tried jointly with Pelle that DePierre would elect to testify. Nor was there any basis for believing that if DePierre did testify, his testimony in his own interest would help

10

Pelle. There was no proffer by Pelle about what DePierre's testimony would be if he survived in good enough shape to be retried and if he elected to testify. Cf. United States v. Pepe, 747 F.2d 632, 651–52 (11th Cir. 1984) (holding that, absent a "concrete showing that [a co-defendant] would testify for [the appellant] if they were tried separately" or a "proffer [of] what his testimony would be," an appellant cannot show compelling prejudice from a denial of a motion for severance).

For all of these reasons, the district court did not abuse its discretion in refusing to grant Pelle's motion for a mistrial based on the fact that one had been granted for DePierre.

## III.

Pelle's second contention focuses on the deliberate ignorance instruction the court gave the jury. He makes two arguments against it. First, Pelle argues that no deliberate ignorance instruction at all should have been given because there was no evidentiary basis for one in this case. There was no evidentiary basis for one, he asserts, because the government's evidence, if believed—and it was overwhelming—proved that he had specific knowledge of the fraud; there was no evidence that he deliberately kept himself ignorant of the falsity of the statements in order to avoid learning what he only suspected. While not denying that its evidence proved Pelle's guilty knowledge many times over, the government

11

responds that the deliberate ignorance instruction was justified by Pelle's own testimony that he had merely been "unbelievably" stupid.

The law of this circuit is that giving a deliberate indifference instruction which is not supported by evidence that the defendant kept himself ignorant of the wrongdoing is not reversible error because giving this type of instruction in that circumstance will at worst be harmless error. United v. Kennard, 472 F.3d 851, 858 (11th Cir. 2006), cert. denied, 128 S. Ct. 454 (2007); United States v. Stone, 9 F.3d 934, 937–40 (11th Cir. 1993). The Kennard and Stone decisions foreclose Pelle's argument based on the lack of evidence that he was deliberately ignorant.

Pelle's other argument about the deliberate ignorance instruction is that it misstated the law. "We review the legal correctness of a jury instruction de novo, but defer on questions of phrasing absent an abuse of discretion." United States v. Prather, 205 F.3d 1265, 1270 (11th Cir. 2000) (citation omitted). The particular part of the instruction about which Pelle complains reads:

> So, with respect to the issue of the Defendant's knowledge in this case, if you find from all the evidence beyond a reasonable doubt that the Defendant knew that certain representations were being made by Pantheon employees or references to prospective customers, and deliberately and consciously tried to avoid learning the falsity of these representations in order to be able to say that he did not know that the representations were false, you may treat such deliberate avoidance of positive knowledge as the equivalent of knowledge.

The misstatement, according to Pelle, is that the instruction refers to "certain

12

representations," instead of limiting them to those that were material.

Jury instructions are to be considered in the context of the entire charge and the events at trial. United States v. Johnson, 139 F.3d 1359, 1366 (11th Cir. 1998). In addition to the challenged instruction, the district court also instructed the jury that "a Defendant can be found guilty of [fraud] only if all of the following facts are proved beyond a reasonable doubt" and listed, among the other elements, "[t]hat the false or fraudulent pretenses, representations or promises related to a material fact." Reading the charge as a whole, the instructions properly informed the jury that Pelle could be found guilty of fraud only if he made a material misrepresentation, including the "certain representations" referred to in the deliberate indifference instruction. The district court did not abuse its discretion in the phrasing of the instruction.

## IV.

Pelle's third contention is that the district court in determining his advisory guideline range miscalculated the amount of loss resulting from his fraud. We review de novo the district court's interpretation and application of the guidelines, and its loss calculation only for clear error. United States v. Hamaker, 455 F.3d 1316, 1336 (11th Cir. 2006). While the district court needs to make a only reasonable estimate of the amount of loss, U.S.S.G. § 2B1.1 cmt. n.3(C), if a

13

defendant objects to the amount of loss in the PSR, the government must use "reliable and specific evidence" to prove the amount by a preponderance of the evidence. United States v. Lawrence, 47 F.3d 1559, 1566 (11th Cir. 1995).

Pelle argues that the district court erred in calculating the amount of loss because it did not reduce the amount by the actual value of the kiosks that were delivered. That value, Pelle asserts, is the expense of purchasing, shipping, and installing the kiosks. The government responds that those expenses were incurred in perpetrating the fraud and should not be credited to Pelle's benefit in arriving at the amount of loss.

Costs incurred in defrauding victims should not be deducted from a defendant's loss calculation. See United States v. Craiglow, 432 F.3d 816, 820–21 (8th Cir. 2005) ("We have previously rejected the argument that one who commits a fraud is entitled to his business expenses 'in perpetrating a fraud.'" (citation omitted)); United States v. Schaefer, 291 F.3d 932, 944 (7th Cir. 2002) (declining to credit the defendant "the cost of matting and framing [counterfeit] artwork" against the amount of loss caused by the defendant); United States v. Sayakhom, 186 F.3d 928, 947 (9th Cir. 1999) ("[I]f the 'value' to the victim is merely a part of the fraudulent scheme, the defendant is not entitled to a credit."). This does not mean, however, that Pelle was not entitled to some credit for these costs.

14

When a defendant's offense level is calculated under U.S.S.G § 2B1.1, the amount of loss must "be reduced by . . . the fair market value of the property returned and the services rendered, by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected." U.S.S.G. § 2B1.1 cmt. n.3(E). The district court did not reduce the amount of loss at all for the value of the kiosks because it found that "in the overall scheme of things, those machines to the people that they were sent [to] were worthless. They did not have any value to them under the circumstances." Arguably, the court applied the wrong standard by focusing on the value of the machines to the victims, instead of their value on the market, although it may be there is no distinction—what a machine is worth on the market is what it is worth to any person, including the victim. We need not decide that fine point.

The application of the standard made no difference in this case. There was no evidence that the machines had any value at all in the market. Their only value appears to have been as useful instruments of fraud. The victims would not have purchased the machines without the fraudulent misrepresentations Pelle and his co-conspirators made. Nor is there any evidence that anyone else would purchase them absent fraudulent misrepresentations. As to Pelle's cost in shipping and handling the machines, that was the cost of doing business and the business was

fraud. The guidelines do not permit defendants to deduct from the losses they have caused their victims the cost the defendants incurred in inflicting the fraud.

## V.

Pelle's fourth contention is that his Sixth Amendment right to a jury trial was violated when the district court found and considered the number of victims and the amount of loss, because those facts were neither admitted by him nor found by a jury. Our case law squarely forecloses this argument. See United States v. Rodriguez, 398 F.3d 1291, 1300 (11th Cir. 2005) (stating that it is not error to apply "extra-verdict enhancements— enhancements based on facts found by the judge that were not admitted by the defendant or established by the jury verdict—that le[a]d to an increase in the defendant's sentence"). So long as the district court treats the guidelines as advisory, it may use in sentencing facts that it finds under a preponderance of the evidence standard. United States v. Smith, 480 F.3d 1277, 1281 (11th Cir.), cert. denied, 128 S. Ct. 175 (2007); United States v. Chau, 426 F.3d 1318, 1322–23 (11th Cir. 2005). The district court did not violate Pelle's constitutional rights when it found by a preponderance of the evidence that he defrauded ninety-two victims and was responsible for $2,812, 652 in losses.

## VI.

Pelle's final contention is that the district court erred when it enhanced his offense level for obstruction of justice. He argues that the district court erred by finding that he perjured himself because the contradictions between his testimony and that of the government witnesses could have been the result of mistaken memory caused by the "huge time span" between the fraud and the trial, not "the willful intent to provide false testimony" necessary for perjury. See United States v. Dunnigan, 507 U.S. 87, 96, 113 S. Ct. 1111, 1117 (1993). When reviewing the district court's factual findings underlying an obstruction of justice enhancement for perjury, we review only for clear error and give "great deference to the district court's credibility determinations." United States v. Gregg, 179 F.3d 1312, 1316 (11th Cir. 1999). The district court heard all of the testimony, including Pelle's, and found that he intentionally lied. Nothing in the record indicates that Pelle's falsehoods were anything else. The court's finding was not clear error.

Pelle's second argument that the district court erred in applying an enhancement for obstruction of justice is that the court failed to specify the materially false statements.[2] The district court, however, specifically stated that

---

[2] In Pelle's initial brief, he asserts that "the court may have improperly relied upon a transcript of a recording allegedly between Pelle and a government cooperator, Steven Mishkin, who never testified at trial." Aside from that statement, Pelle does not explain in either his initial or reply brief why that would be error. A party waives an issue on appeal when he "fail[s] to elaborate or provide any citation of authority in support of . . . [an] allegation." Flanigan's Enters. v. Fulton County, 242 F.3d 976, 987 n.16 (11th Cir. 2001); see also Greenbriar, Ltd. v. Alabaster, 881 F.2d 1570, 1573 n.6 (11th Cir. 1989) (holding that when a party only refers to an

17

Pelle had committed perjury when he testified that he did not know about any legitimate complaints about the kiosks. There is abundant evidence in the record to support that finding, which is enough by itself to support the obstruction of justice enhancement.

Moreover, if a district court makes a general finding of obstruction of justice that encompasses all of the factual predicates of perjury, then specific findings are not necessary. United States v. Lewis, 115 F.3d 1531, 1538 (11th Cir. 1997) ("Although separate and clear findings that address each element of the alleged perjury are preferable, a general finding that an [obstruction of justice] enhancement is warranted suffices if it encompasses all of the factual predicates necessary for a perjury finding.") Here, the district court found that "there was ample evidence that [Pelle] was perjurious during his testimony in the case." The court's use of the term "perjurious" obviously conveys that the court found the factual predicates for perjury. See id. (holding that a district court stating that the defendant's testimony was a "concoction" was a sufficient finding to support an obstruction of justice enhancement.); see also United Statse v. Arguedas, 86 F.3d 1054, 1056 (11th Cir. 1996).

---

issue "in its Statement of the Case in its initial brief [and] it elaborates no arguments on the merits as to this issue in its initial or reply brief[,] . . . the issue is deemed waived."). Because Pelle makes nothing more than a bare allegation of error without explaining why it is error, we deem the point waived and will not address it further.

18

## VII.

The conviction and sentence are AFFIRMED.