**Martin J. BRADLEY, III,**
**Movant-Appellant,**

v.

**UNITED STATES of America,**
**Respondent-Appellee.**

No. 14-10463

United States Court of Appeals,
Eleventh Circuit.

(January 19, 2017)

Jeffrey S. Bucholtz, John A. Drennan, King & Spalding, LLP, Washington, DC, Christopher Cullom Burris, King & Spalding, LLP, Atlanta, GA, Timothy H. Lee, U.S. Attorney's Office, Atlanta, GA, Donald F. Samuel, Garland Samuel & Loeb, PC, Atlanta, GA, Janice Arlene Singer-Capek, Thompson & Singer, PA, Atlanta, GA, for Petitioner-Appellant

Thomas Henderson Dupree, Jr., Gibson Dunn & Crutcher, LLP, Washington, DC,

R. Brian Tanner, James D. Durham, Edward J. Tarver, U.S. Attorney's Office, Savannah, GA, for Respondent-Appellee

Terrance Patrick Roberts, Roberts Law Office, Tallahassee, FL, for Amicus Curiae Primary Pharmaceuticals, Inc.

Thomas Henderson Dupree, Jr., Gibson Dunn & Crutcher, LLP, Washington, DC, for Amicus Curiae National Association of Criminal Defense Lawyers

Before JORDAN and ANDERSON, Circuit Judges, and DALTON,* District Judge.

PER CURIAM:

A grand jury indicted Martin J. Bradley III and others on numerous charges stemming from their alleged participation in several schemes to defraud the Florida and California Medicaid programs. After six weeks of trial, and seven days of deliberations, a jury convicted Bradley of 247 felonies, including racketeering, mail fraud, wire fraud, and money laundering. *See* 18 U.S.C. §§ 371, 1341, 1343, 1956, & 1962. The district court sentenced Bradley to a total of 300 months' imprisonment, and we affirmed his convictions and sentence on appeal. *See United States v. Bradley*, 644 F.3d 1213 (11th Cir. 2011).

After his direct appeal, Bradley filed a motion to vacate pursuant to 28 U.S.C. § 2255, asserting various grounds for relief. The district court denied the motion, *see Bradley v. United States*, No. 4: 13–CV–121, 2013 WL 6246775 (S.D. Ga. Dec. 3, 2013), and Bradley now appeals. With the benefit of oral argument, and following review of the extensive record, we affirm in part and reverse in part.

---

* The Honorable Roy B. Dalton, United States District Judge for the Middle District of Florida, sitting by designation.

## I

Bradley and his father, Martin J. Bradley, Jr. ("Bradley, Jr."), owned Bio-Med Plus, Inc., a pharmaceutical wholesaler based in Miami. As relevant here, Bio-Med bought and sold blood-derivative medications, which are used to treat patients who suffer from viral diseases, immune deficiencies, and clotting disorders.

At trial, the government presented evidence of several fraudulent schemes carried out by Bio-Med, Bradley, Bradley, Jr., and other co-conspirators. Many of the schemes involved the so-called "recycling" of medications prescribed to patients who were covered by Florida Medicaid, California Medicaid, or the California Genetically Handicapped Persons Program ("GHPP"). Recycling, at least as that term is used here, refers to a process where medication is dispensed to patients, but not administered to them, and then repurchased and resold. Once a prescription was issued and billed to the Medicaid agencies, Bio-Med bought back unused medication from both clinics and patients at a fraction of the price. Then, Bio-Med resold the unused medications to pharmacies, which billed Medicaid again for the same drugs.

The government argued that Bradley and his co-conspirators caused the Florida and California Medicaid programs to pay for drugs they knew would not be taken as prescribed, bought back the drugs at a discount, and then resold the drugs for a significant profit. To carry out the Florida Medicaid scheme, Bradley and his co-conspirators paid physicians for the blood-derivative medications that went unused when a patient failed to appear at the clinic for an infusion appointment. To carry out the California Medicaid and GHPP schemes, Bradley and his co-conspirators made arrangements with patients to buy back drugs that had already been delivered to those patients and billed to California Medicaid and GHPP. Once the medication was obtained from the clinics or patients, it was sent to Bio-Med, relabeled, and resold. Often, the co-conspirators falsified records to disguise the source of the drugs, created phony invoices, and forged signatures in prescription books to cover up Medicaid billing for no-show patients.

Not all of the schemes were "recycling" schemes. For example, Bradley and his co-conspirators also engaged in a so-called "diversion" scheme, in which they used false pretenses to gain access to a restricted market for blood-derivative medications by representing that they would not sell the drugs on the open market, which they eventually did (at a high markup) after the product was recycled and delivered to Bio-Med. Bio-Med also sourced blood-derivative medications from Liz Pascual, who testified that she bought them from a source she developed for "a lot less" than the manufacturer's price. She then sold those medications to Bradley, who instructed her to prepare invoices with the notation "direct account with manufacturer," a phrase that made it appear as if the drugs had a legitimate pedigree.

As noted, the jury convicted Bradley of 247 charges; Bradley, Jr., of four charges; Albert L. Tellechea, another co-conspirator, of one charge; and Bio-Med of 53 charges. The jury acquitted five other defendants on all charges against them.

## II

In an appeal from the denial of a § 2255 motion, we review factual findings for clear error and legal rulings de novo. See Rhode v. United States, 583 F.3d 1289, 1290 (11th Cir. 2009). Bradley raises three issues. First, he contends that his counsel rendered ineffective assistance at trial by failing to investigate and present a defense on the "materiality" element of mail and wire

fraud. Second, he argues that his appellate counsel furnished ineffective assistance on direct appeal by failing to raise a claim based on a supplemental racketeering instruction the district court gave to the jury over the objections of both sides. Third, he claims that the district court committed reversible error when it communicated with the jury during deliberations without notifying defense counsel or the government. Although Bradley raised his ex parte jury communication claim for the first time in his § 2255 motion, he asserts that the claim should be addressed on the merits because he has established cause and prejudice.

## III

An element common to both mail and wire fraud, *see* 18 U.S.C. §§ 1341 & 1343, is a scheme or artifice to defraud another of money or property, which requires a material misrepresentation, omission, or concealment of a material fact. *See Bradley*, 644 F.3d at 1238–39. *See also Neder v. United States*, 527 U.S. 1, 4, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999) (holding that "materiality is an element of the federal mail fraud [and] wire fraud" statutes). "A misrepresentation is material if it has a natural tendency to influence, or is capable of influencing, the decision maker to whom it is addressed." *United States v. Maxwell*, 579 F.3d 1282, 1299 (11th Cir. 2009) (internal quotation marks omitted).

■ Bradley contends that the government had to prove that not disclosing the recycled status of the medications "had a natural tendency to influence, or was capable of influencing, the agencies' decision to pay for the products." *See* Br. of Appellant at 22–23. He argues that his trial counsel rendered ineffective assistance when they failed to defend on the element of materiality.

To prove ineffective assistance, Bradley must show that (1) his counsel's performance was deficient, and (2) the deficient performance prejudiced his defense. *See Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Because a failure to show either deficient performance or prejudice is fatal to a *Strickland* claim, a court need not address both *Strickland* prongs if one is not satisfied. *See Cox v. McNeil*, 638 F.3d 1356, 1362 (11th Cir. 2011).

At trial, the government presented evidence from three witnesses to demonstrate that the defendants' failure to disclose how they obtained the medications was material because the Florida and California Medicaid agencies would not knowingly pay for recycled blood-derivatives. First, Douglas Hillblom, an employee of California Medicaid, testified that the agency does not pay for the same drug twice. Mr. Hillblom also testified that, pursuant to Board of Pharmacy storage condition regulations, blood-derivative medications dispensed to patients could not be returned to pharmacies for credit back to California Medicaid. According to Mr. Hillblom, the no-credit rule stems from concerns over "contamination or degradation of the product" once it leaves "the control of the pharmacy." Second, Harry Fry, an employee with the California Department of Health Services, testified that California's GHPP would not pay for the same drug twice, nor would it "allow for payment of drugs for use by anyone else but the person to whom it was dispensed." Finally, Jerry Wells, the Bureau Chief of Pharmacy Service for Florida Medicaid, testified that Florida Medicaid would not "pay for the same drug twice" except "unknowingly" in "fraudulent situations." He also testified that pharmacy regulations prohibited dispensing drugs without patients present.

Bradley argues that the testimony of these three witnesses was "cursory and unsubstantiated" because none of them "identified the source of the rule or official policy he purported to be describing." *See* Br. of Appellant at 5. Without more, says Bradley, the government's case on the element of materiality was vulnerable to an attack that never came. Defense counsel did not examine Mr. Wells and Mr. Fry at all, and only briefly cross-examined Mr. Hillblom to confirm that certain medication cannot be returned to a pharmacy. *See id.* at 34–35. Furthermore, Bradley argues that defense counsel failed to discover and present evidence that, at the time, there were no formal policies prohibiting payments for recycled drugs. According to Bradley, "[t]he only remotely relevant evidence counsel presented [on the materiality of recycling issue] was Lawrence 'Ron' Nicholson's testimony that he could not find a California regulation prohibiting pharmacies from reselling unused, returned products." *Id.* at 33. As a result, Bradley contends that his counsel were constitutionally ineffective for failing to prove that, even if the agencies had been aware that they already paid for medication once, they would have paid for recycled medication a second time. Put differently, Bradley says that his counsel failed to establish that the recycled status of the medication was immaterial to the alleged victims of the charged fraudulent schemes.

To establish the performance prong of his ineffective assistance claim, Bradley "must show that counsel's representation fell below an objective standard of reasonableness." *Strickland,* 466 U.S. at 687–88, 104 S.Ct. 2052. "The test has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial."

*White v. Singletary,* 972 F.2d 1218, 1220 (11th Cir. 1992).

We approach the *Strickland* performance inquiry armed, unavoidably, with the double-edged sword that is hindsight. We know that Bradley was convicted of many crimes, "and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052. But *Strickland* instructs us to be "highly deferential" when we scrutinize counsel's performance. *Id.* "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* There, therefore, is a " 'strong presumption' that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than 'sheer neglect.' " *Harrington v. Richter,* 562 U.S. 86, 109, 131 S.Ct. 770, 178 L.Ed.2d 624 (2011) (quoting *Yarborough v. Gentry,* 540 U.S. 1, 8, 124 S.Ct. 1, 157 L.Ed.2d 1 (2003)). In other words, we generally will not second guess a lawyer's strategic choices.

Bradley was represented at trial and on appeal by a nationally renowned team of experienced criminal defense lawyers. When we review the performance of experienced trial counsel, "the presumption that [their] conduct was reasonable is even stronger." *Chandler v. United States,* 218 F.3d 1305, 1316 (11th Cir. 2000) (en banc). That is not to say that the performance of experienced counsel is above reproach. Even a Clarence Darrow can have a bad day. But our cases recognize that "the more experienced an attorney is, the more likely it is that his decision to rely on his own experience and judgment in rejecting

a defense" is reasonable. *Spaziano v. Singletary*, 36 F.3d 1028, 1040 (11th Cir. 1994) (quoting *Gates v. Zant*, 863 F.2d 1492, 1498 (11th Cir. 1989)).

Bradley has not overcome the strong presumption that his counsel acted reasonably in this case. At trial, counsel chose to argue that Bradley made no misrepresentations to the Florida and California Medicaid programs. To support that defense theory, counsel argued that nothing in the state regulations precluded recycling. They also argued that there was no proof that any of the medications at issue were actually recycled, so there could be no misrepresentation as to their recycled status.[1]

Defense counsel's decision to develop one theory of defense rather than another—in this case, a defense focused on the absence of misrepresentations rather than lack of materiality—is not tantamount to deficient performance. That is so even if defense counsel failed to consider the sort of immateriality-of-recycling defense that Bradley has developed in his briefs. *See Chandler*, 218 F.3d at 1316 n.16 ("No lawyer can be expected to have considered all of the ways. If a defense lawyer pursued course A, it is immaterial that some other reasonable courses of defense (that the lawyer did not think of at all) existed...."). And it is entirely possible that counsel chose not to focus on materiality because it might cut against the argument that there were no misrepresentations to begin with. It is risky to defend on a "we may have lied but it didn't matter" theory, even if that theory is only presented in the alternative. As we have recognized, "good advocacy requires the winnowing of some arguments in favor of stressing others: multiplicity of arguments or defenses hints at the lack of confidence in any one." *Rogers v. Zant*, 13 F.3d 384, 388 (11th Cir. 1994).

Bradley has failed to establish deficient performance, and his ineffective assistance of counsel claim therefore fails.

## IV

While the jury was deliberating, the district court decided to give a supplemental RICO instruction over the objections of both sides. At the time, the jury was not deadlocked and had not expressed any confusion about the original RICO instruction. But the district court nevertheless concluded that the jury "need[ed] some help" and provided what it described as a "simplified" explanation of RICO. *See* D.E. 1019 at 17. The instruction—delivered to the jury in writing during its fifth day of deliberations—explained again the distinction between the 200+ counts of the indictment and the 200+ racketeering acts alleged as part of the RICO charge. The supplemental instruction also included this sentence: "As you would know from my instructions and the verdict, you must reach a verdict of 'guilty' or 'not guilty' as to each defendant and as to each of the 258 counts."

■ Bradley argues that the supplemental jury instruction was coercive, and that his counsel on direct appeal (the same lawyers who tried the case) rendered ineffective assistance because they failed to raise a claim based on the supplemental

---

1. During closing arguments, Bradley's defense counsel argued: "We asked numerous people[,] is there any proof that the factor obtained from patients was ever resold. They could find no proof through their computer systems, through anything else, other than the supposition of the three cooperators that any-

thing was ever resold." And the point was reiterated: "If it was resold, and by the way, we kept asking, is there proof that it was resold, that it went through this and came back, and was sold a second time. Is there any proof of that? There is no proof. None."

instruction, even though they objected to the instruction at trial. Again, *Strickland* requires satisfaction of two elements: deficient performance and prejudice. *See Smith v. Robbins*, 528 U.S. 259, 285, 120 S.Ct. 746, 145 L.Ed.2d 756 (2000). Here, even if we assume that counsel performed deficiently on appeal, we cannot say that Bradley was prejudiced by their failure to challenge the supplemental jury instruction.

To establish prejudice, Bradley must demonstrate a reasonable probability that, but for counsel's alleged error in raising the jury instruction issue on appeal, the outcome would have been different. *See Smith*, 528 U.S. at 285, 120 S.Ct. 746; *Strickland*, 466 U.S. at 694, 104 S.Ct. 2052. He has not met that burden.

The coercive-instruction cases Bradley relies on arose in a scenario where the jury had announced it was deadlocked. *See, e.g., United States v. Jones*, 504 F.3d 1218, 1219 (11th Cir. 2007); *Hooks v. Workman*, 606 F.3d 715, 742–43 (10th Cir. 2010); *Smith v. Curry*, 580 F.3d 1071, 1079 (9th Cir. 2009); *United States v. Yarborough*, 400 F.3d 17, 20–22 (D.C. Cir. 2005); *United States v. McElhiney*, 275 F.3d 928, 934 (10th Cir. 2001); *United States v. Paniagua–Ramos*, 135 F.3d 193, 194 (1st Cir. 1998). These decisions demonstrate that when a jury has announced a deadlock, certain instructions (including instructions telling the jury that it must reach a verdict) create a danger of coercion and prejudice. But Bradley has not cited any authority to support the proposition that an instruction like the one given here is coercive *per se* when the jury is not deadlocked.

In our view, the reasonable probability of prejudice is significantly diminished where, as here, there is ample evidence to support conviction, *cf. Boschen v. United States*, 845 F.2d 921, 922 (11th Cir. 1988) (holding that the defendant could not establish *Brady* violation, which requires showing a reasonable probability that the outcome of the proceedings would have been different had the allegedly exculpatory evidence been disclosed, because the evidence of guilt was overwhelming), and there is no indication that the jury was deadlocked or that it was pushed to make a decision it otherwise would not have. As the Seventh Circuit has explained, "a non-deadlocked jury is less susceptible to such coercion." *Cramer v. Fahner*, 683 F.2d 1376, 1389 (7th Cir. 1982).

Because Bradley has not shown a reasonable probability that the instruction affected the outcome of his trial, he cannot satisfy the prejudice prong of *Strickland*. As a result, his ineffective assistance of counsel claim with respect to the supplemental jury instruction fails.

## V

Throughout the trial, the jury sent several notes to the district court. Most dealt with non-substantive issues. One note, for example, asked the court if it would grant a juror permission to participate in an in-law's wedding. Another asked the court if it would allow certain jurors to phone their families. Two of the jury notes, however, were substantive, and the district court's ex parte responses to them form the basis for Bradley's third claim.

## A

On March 24, 2006, the second day of deliberations, the jury sent the first substantive note, which requested a dictionary. Without notifying or consulting the parties, the district court responded:

I cannot provide you with a dictionary. You have the charts and exhibits which are replete with definitions. You also have the charge and summary charts.

The problem with the district court's response, besides the fact that it was sent without the parties' knowledge, is that at trial the charts, summary charts, and exhibits were primarily (though not exclusively) introduced by the government.

Later that same day, the jury sent the second substantive note. In it, the jury asked: "Do you treat the company and the owner of the company differently in the acts? Because we are confused on how to distinguish between the company and the individual." When it received the jury's second note, the district court convened the parties to discuss an appropriate response but did not disclose the existence of the first note it had received earlier that day or its response to that note.

Defense counsel argued that the district court's response to the second note should make clear that the liability of a company and its owner must be assessed independently. The government asked the district court to include language advising the jury that a corporation can only act through its agents. Ultimately, the parties and the district court reached a compromise on the following response, which was sent to the jury:

> In answer to your question, the owners and the corporation are separate defendants, so you must consider them separately as to each count. Of course, the corporation can only act through its agents who can be its owners, employees, etc.

The jury did not send another note that day, and there was no indication it needed additional clarification from the district court.

Nevertheless, the following morning the district court sent an unprompted instruction to the jury, this time without advising the parties or giving them an opportunity to be heard. This follow-up instruction stated:

> If my answer to your question yesterday was insufficient let me know. I shall explain further. Once again, a corporation can only act through its agents and employees, who may also be the owners.

The follow-up instruction reiterated the language the government wanted—that a corporation can only act through its agents who may be the owners—but it left out the agreed-to language that a corporation and its owners must be considered separately.

The jury responded to the district court's unsolicited follow-up instruction with a note of its own: "Your answer cleared up any misunderstanding there may have been." This note was also not provided to the parties, and it is unclear whether the jury was referring to the initial note or the follow-up instruction.

Bradley, like the government, was not aware of the two ex parte messages the district court sent the jury, or of the jury's response to the second follow-up instruction. Understandably, therefore, he did not object to them before the jury reached its verdict.

On March 31, 2006, two days after trial ended, the clerk docketed the undisclosed notes and the district court's responses. But the docketing was done in a way that made it appear as though they had been filed contemporaneously on the day the communications actually occurred, even though the notes and responses were not docketed until after trial was over and counsel had been excused. So, even if defense counsel had been monitoring the docket for new entries made after trial, it would have appeared as if no new entries were made on March 31:

To notice the entries docketed on March 31, counsel would have had to scroll up the docket to find entries 591 and 592, which, though numerically out of sequence, appeared as if they had been docketed on March 24 and March 25:

To make detection even more difficult, the new docket entries were simply labeled "jury notes," an innocuous description that would not have alerted government or defense counsel that the entries contained anything other than the jury notes and responses they were made aware of during trial. Perhaps not surprisingly, defense counsel did not discover the undisclosed ex parte notes until after Bradley's convictions and sentence were affirmed on direct appeal, and raised them for the first time in the subsequent § 2255 motion.

**B**

Generally, a claim that could have been asserted on direct appeal is barred if it is raised for the first time on collateral review. *See Davis v. United States*, 417 U.S. 333, 345 n.15, 94 S.Ct. 2298, 41 L.Ed.2d 109 (1974). A prisoner who wishes to obtain collateral review of a defaulted claim must demonstrate cause for the default and actual prejudice resulting from the alleged error. *See Bousley v. United States*, 523 U.S. 614, 622, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998); *United States v. Frady*, 456 U.S. 152, 167–68, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982).

In its order denying Bradley's § 2255 motion, the district court agreed that it had erred in engaging in undisclosed communications with the jury and not advising the parties of the instructions it had sent on its own (and the one it had received in response). Although it believed that its ex parte communications likely "focused the jury's attention on the [g]overnment's view of the case," and "risked suggesting to the jury that [the government's materials] were reliable sources of information [it] approved of," *Bradley*, 2013 WL 6246775, at *13, the district court denied Bradley

relief. It concluded that any claim related to the ex parte communications was procedurally barred because Bradley had not raised the claim on direct appeal and had not shown cause for his failure to do so.

## C

■ We agree with Bradley that the district court erred in communicating with the jury without giving defense counsel (and the government) notice and an opportunity to be heard. Under Federal Rule of Criminal Procedure 43(a), a criminal defendant is entitled to be present at all stages of his trial, including the stage when the court responds to notes from the jury. *See Rogers v. United States*, 422 U.S. 35, 38, 95 S.Ct. 2091, 45 L.Ed.2d 1 (1975); *United States v. Rapp*, 871 F.2d 957, 966 (11th Cir. 1989), *overruled on other grounds by United States v. Wells*, 519 U.S. 482, 486 n.3, 117 S.Ct. 921, 137 L.Ed.2d 107 (1997). *See also Fillippon v. Albion Vein Slate Co.*, 250 U.S. 76, 81, 39 S.Ct. 435, 63 L.Ed. 853 (1919) ("We entertain no doubt that the orderly conduct of a trial by jury, essential to the proper protection of the right to be heard, entitles the parties who attend for the purpose to be present in person or by counsel at all proceedings from the time the jury is impaneled until it is discharged after rendering a verdict."). As *Rogers* made clear, "the jury's message[s] should have been answered in open court and [Bradley's] counsel [and the government] should have been given an opportunity to be heard before the trial judge responded." *Rogers*, 422 U.S. at 39, 95 S.Ct. 2091.

Whether Bradley's claim relating to the district court's ex parte communications is defaulted "is a mixed question of law and fact, which we review *de novo*." *Fordham v. United States*, 706 F.3d 1345, 1347 (11th Cir. 2013). As noted, when it resolved the § 2255 motion, the district court concluded

that Bradley had shown actual prejudice but failed to demonstrate cause, and therefore his jury note claim was procedurally defaulted. We address cause first, and then turn to prejudice.

## 1

A prisoner can establish cause for a procedural default by showing that "some objective factor external to the defense impeded counsel's efforts to comply with the ... procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1988). This may be done by "showing that the factual or legal basis for a claim was not reasonably available to counsel ... or that some interference by officials made compliance impracticable." *Id.* (citations omitted). For example, in *Strickler v. Greene*, 527 U.S. 263, 283 & n.23, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999), the Supreme Court held that the petitioner established cause for failing to raise a *Brady* claim prior to federal habeas because the prosecution asserted an open file policy and the petitioner reasonably relied on the pertinent file to contain all *Brady* materials. And in *Ward v. Hall*, 592 F.3d 1144, 1176–77 (11th Cir. 2010), we found cause in a case where some jurors in a capital case had asked a bailiff a question about the possibility of sentencing the petitioner to life without parole, but the questions and the bailiff's answer to that question (that such a sentence was not available) were not given in open court. As we explained, "[t]he external impediment in this case stems from the failure of the bailiff and/or trial judge to inform Ward or his counsel about the jury's question concerning parole." *Id. See also id.* at 1178 ("[W]e conclude that Ward established sufficient cause to excuse his procedural default based on the state's concealment of the jury's question regarding parole.").

■ Although the length of time it took Bradley's counsel to discover the ex parte notes and communications gives us some pause, we conclude, contrary to the district court, that Bradley has established sufficient cause. A confluence of external factors impeded defense counsel's ability to raise, at trial or on direct appeal, claims concerning the district court's ex parte communications with the jury. First, the parties were never advised about the two jury notes at issue and the district court's ex parte responses (or the jury's own follow-up note). Second, as described earlier, the notes and responses were filed and described in a way that made them appear as though they had been docketed contemporaneously during deliberations. And because the jury had sent some notes during trial and deliberations that had been provided to the parties, there was no reason for anyone to think the unthinkable—that they had not been told that the jury had asked questions during deliberations, and that, even worse, the district court had chosen to respond more than once to the notes in an ex parte fashion. Even if defense counsel (who also represented Bradley on direct appeal) had been monitoring the docket for new entries after trial, it would have appeared as if no new entries were made on March 31.

In sum, defense counsel, like the government, had no reason to suspect substantive ex parte communications by the district court as a result of non-disclosed jury notes and therefore had no reason to scour the docket for evidence of such communications. Defense counsel likewise had no reason to suspect the docketing discrepancy that occurred here. In fact, no one should have reason to suspect the back dating of docket entries, since such a practice would surely undermine public confidence in the courts. Under these circumstances, we decline to place such a burden on defense counsel. The obstacle to raising claims concerning the ex parte communications was external to Bradley and his counsel, who were justified in thinking that the district court had acted appropriately (i.e., that it had not engaged in undisclosed ex parte communications with the jury about substantive issues), and that the docket would have accurately reflected any undisclosed communications with the jury.[2]

### 2

To demonstrate prejudice sufficient to excuse the procedural bar and obtain collateral relief, however, Bradley must show "actual prejudice" resulting from the district court's ex parte communications, a "significantly higher hurdle than would exist on direct appeal." *Frady*, 456 U.S. at 166–67, 102 S.Ct. 1584. "To establish 'prejudice' [under the cause and prejudice standard], a petitioner must show that there is at least a reasonable probability that the result of the proceeding would have been different." *Henderson v. Campbell*, 353 F.3d 880, 892 (11th Cir. 2003).

"A jury's interruption of its deliberations to seek further explanation of the law is a critical moment in a criminal trial...." *United States v. Kopstein*, 759 F.3d 168, 172 (2d Cir. 2014) (internal quotation marks and citation omitted). And "the influence of the trial judge on the jury is necessarily and properly of great weight," *Coats & Clark, Inc. v. Gay*, 755 F.2d 1506, 1512 (11th Cir. 1985) (quoting *Quercia v. United States*, 289 U.S. 466, 470, 53 S.Ct. 698, 77 L.Ed. 1321 (1933)), as "jurors are ever watchful of the words that fall from him," *Bollenbach v. United States*, 326

---

2. Because we have determined that Bradley established cause to excuse his procedural default, we need not address his alternative argument that trial counsel was ineffective by failing to discover the ex parte communications.

U.S. 607, 612, 66 S.Ct. 402, 90 L.Ed. 350 (1946). "Particularly in a criminal trial, the judge's last word is apt to be the decisive word." *Id.* When a court responds to the jury without giving counsel notice and an opportunity to be heard, "the aggrieved party will have lost the value of the chance: the opportunity to convince the judge that some other or different response would be more appropriate, the circumstances considered." *United States v. Parent,* 954 F.2d 23, 26 (1st Cir. 1992). "Being kept in the dark, ... counsel [is] powerless to prime the pump of persuasion." *Id.*

■ With respect to the jury's request for a dictionary, the district court · explained that its response was actually prejudicial because it "directed the jury to materials put together by the [g]overnment and containing the [g]overnment's take on the case." *Bradley,* 2013 WL 6246775, at *13. Bradley contends that the district court correctly found that, "[g]iven the sheer volume of evidence in this case, the [district court's] response to the jury's request for a dictionary focusing the jury on certain items prepared by the [g]overnment very well may have improperly influenced the verdict." Br. of Appellant at 53. The government responds that "[t]here [is] no indication of what term the jury wanted to define when it asked for a dictionary, what counts or defendants that unknown definition might have related to, or what importance, if any, that definition ultimately played in the jury's deliberations." Br. of Appellee at 57–58.

On the note responding to the request for a dictionary, we agree with the government and conclude that Bradley has not shown actual prejudice. First, the ex parte nature of the note is insufficient, in and of itself, to show prejudice. *See generally United States v. Brantley,* 68 F.3d 1283, 1291 (11th Cir. 1995) (noting that "there is

no blanket prohibition against the ex parte examination of jurors by a trial judge" and that, even if such communication violated Rule 43, the error may be harmless). Indeed, a court's ex parte communications with a jury (or juror) are subject to harmless error analysis. *See Rushen v. Spain,* 464 U.S. 114, 119–20, 104 S.Ct. 453, 78 L.Ed.2d 267 (1983); *Rapp,* 871 F.2d at 966; *United States v. McDuffie,* 542 F.2d 236, 241 (5th Cir. 1976). Although the district court's note told the jury that it had the charts, summary charts, and exhibits for review, it did not refer the jury to only the government's evidence. Second, although most of the charts, summary charts, and exhibits at trial were introduced by the government, the defense introduced hundreds of exhibits, including the 2001 Florida Medicaid policy manual, Def. Ex. 690, which contained a number of rules and definitions. It is at best unclear whether the jury would have interpreted the note as instructing it to look only at the evidence introduced by the government. *See Jones v. United States,* 527 U.S. 373, 391, 119 S.Ct. 2090, 144 L.Ed.2d 370 (1999) ("Our decisions repeatedly have cautioned that instructions must be evaluated not in isolation but in the context of the entire charge."). Third, given the substantial evidence presented against him, as set out in our opinion on direct appeal, we cannot say that Bradley suffered actual prejudice from the district court's note relating to the request for a dictionary. *See Frady,* 456 U.S. at 169–73, 102 S.Ct. 1584.

**3**

The Supreme Court has acknowledged that an ex parte communication can be harmless in some cases. *See Rushen,* 464 U.S. at 119–20, 104 S.Ct. 453. *See also United States v. Wright,* 392 F.3d 1269, 1280 (11th Cir. 2004) (citing *Rogers,* 422 U.S. at 40, 95 S.Ct. 2091); *Rapp,* 871 F.2d at 966. The district court ruled that the unprompted and ex parte instruction it

provided to the jury about corporate/individual liability was prejudicial because "it arguably altered the law the Court set forth in its initial, agreed upon response." *Bradley*, 2013 WL 6246775, at *14.

In support of the district court's ruling, Bradley argues that, by omitting the admonition to consider individual and corporate defendants separately, the note "may have unduly linked the liability of corporations to the actions of its agents" and "press[ed] the jury to find Bradley guilty if it also found corporate liability for Bio-Med." Br. of Appellant at 55. The government responds that the jury had already been instructed on the omitted phrase—to consider the corporation and individual separately—the day before and in the regular jury instructions. *See* Br. of Appellee at 61. For the reasons which follow, we agree with the district court, but only in part.

We know, from the question that it sent to the court (the one that was disclosed to the parties), that the jury was having some trouble distinguishing the corporate liability from individual liability. That was not, in retrospect, surprising, for the case involved multiple complex schemes carried out by several actors through various entities. It could be difficult to determine whether to attribute criminal acts to Bio-Med or to specific individuals or both. And it is not intuitive that a corporation—a legal entity which exists, legally, apart from its officers, directors, and employees—can be convicted of a crime requiring intent.

The district court's original response, the one the parties had agreed on, achieved a careful balance: it acknowl-

edged the obvious truth that a corporation can only act through its agents, while reminding the jury that it must consider the corporation and its agents separately. The district court's ex parte follow-up instruction, however, focused the jury squarely on the notion that a corporation can only act through its agents. It is likely, we think, that the note led the jury to believe that an individual defendant also must be held responsible for each crime committed by the corporation. This second instruction, the last word the jury heard on the matter, was likely to carry special weight. It is significant, as well, that Bradley and Bio-Med were convicted of all 53 crimes with which they were jointly charged. As to these charges (Counts 1–53), we conclude (in agreement with the district court) that Bradley has shown actual prejudice. *See Henderson*, 353 F.3d at 892.[3]

The cases cited by the government are inapposite. They all stand for the proposition that an ex parte communication with the jury, though inappropriate, can be harmless if it merely accurately restates the law. *See McDuffie*, 542 F.2d at 241; *United States v. Betancourt*, 734 F.2d 750, 759 (11th Cir. 1984); *United States v. Breedlove*, 576 F.2d 57, 60 (5th Cir. 1978). None of these cases support the conclusion that there is no prejudice in the scenario we are presented with here—i.e., when the district court sends an unprompted response to the jury with an incomplete instruction on corporate/individual liability and the corporation and its principal are convicted on all counts in which they were jointly charged.

We do not, however, believe that Bradley has shown actual prejudice on the re-

---

**3.** In support of its argument that the ex parte corporate/individual liability instruction was not prejudicial, the government notes that, in Count 1, which charged a RICO violation, the jury found Bio-Med had committed certain predicate racketeering acts, but not Bradley.

*See* Br. of Appellee at 62. Although this is true, the discrepancy was small. The vast majority of the predicate offenses the jury found as to Bradley and Bio-Med overlapped. And, more importantly, the jury ultimately convicted them both under Count 1.

maining charges on which he was convicted. These charges did not have Bio-Med as a co-defendant, and given the ample evidence presented by the government, it is difficult to see how the district court's second instruction on corporate/individual liability was prejudicial as to them.

Because we have concluded that Bradley established cause and prejudice to excuse the procedural bar on his jury communication claim, the merits analysis does not require much more ink. As we explained, in *Rogers* the Supreme Court recognized that a defendant has the right to be present and participate during communications between a judge and jury. *See Rogers*, 422 U.S. at 38, 95 S.Ct. 2091. That rule was plainly violated here.

Having decided that Bradley demonstrated actual prejudice, we have also necessarily decided—as the government conceded on appeal and as the Fourth Circuit has held—that the error in this case was not harmless as to Counts 1–53. *See Smith v. Dixon*, 14 F.3d 956, 976 (4th Cir. 1994) ("[H]armless error analysis is essentially the same analysis we are required to perform in order to decide whether Smith has shown actual prejudice to excuse his procedural default. . . .").

We therefore reverse the decision of the district court insofar as it rejected Bradley's jury note claim, and direct that Bradley's convictions on Counts 1–53 be set aside. The government can elect to retry Bradley on these charges. But if it chooses not to retry Counts 1–53, then the district court must re-sentence Bradley.

## VI

For the reasons indicated above, Bradley has failed to establish that his counsel rendered ineffective assistance of counsel at trial or on direct appeal.

Bradley has established cause and prejudice to excuse the procedural default of his claim concerning the second ex parte instruction on corporate/individual liability. Although the district court found that the ex parte communications actually prejudiced Bradley, we conclude that the only charges affected by the district court's ex parte instruction to the corporate/individual liability note were those in which both Bradley and Bio-Med were jointly charged and convicted. We therefore reverse as to Counts 1–53, and vacate Bradley's convictions on those counts. As to Bradley's remaining counts of conviction, we conclude that the ex parte instruction on corporate/individual liability did not result in actual prejudice.

The denial of Bradley's § 2255 motion is affirmed in part, reversed in part, and the case is remanded to the district court for further proceedings consistent with this opinion.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**